# Illinois Official Reports

## Appellate Court

***Gatz v. Board of Trustees of the Village of Maywood Police Pension Fund*,
2019 IL App (1st) 190556**

| | |
|---|---|
| Appellate Court Caption | TANGELA GATZ, Plaintiff-Appellant, v. THE BOARD OF TRUSTEES OF THE VILLAGE OF MAYWOOD POLICE PENSION FUND, Defendant-Appellee. |
| District & No. | First District, Fifth Division<br>No. 1-19-0556 |
| Filed | September 20, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 18-CH-8419; the Hon. Michael T. Mullen, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Craig S. Mielke, of Foote, Mielke, Chavez & O'Neil, LLC, of Geneva, for appellant.<br><br>Richard J. Reimer and Mark S. McQueary, of Reimer & Dobrovolny PC, of Hinsdale, for appellee. |
| Panel | PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion.<br>Justices Rochford and Delort concurred in the judgment and opinion. |

¶ 1 The plaintiff, Tangela Gatz, appeals from a judgment of the circuit court of Cook County, which confirmed a decision of the Board of Trustees of the Village of Maywood Police Pension Fund (the Board), denying her application for a surviving spouse's pension pursuant to section 3-112(e) of the Illinois Pension Code (Code) (40 ILCS 5/3-112(e) (West 2016)), based on the death of her husband, Ryan Gatz (hereinafter referred to as Ryan), a police officer in the employ of the Village of Maywood. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 2 Ryan was a member of the Maywood Police Department, having been appointed as a probationary officer on March 19, 2009, and receiving his regular appointment on March 19, 2010. The plaintiff alleged that Ryan died as the result of post-traumatic stress disorder (PTSD), which he developed after an officer-involved shooting on October 25, 2014. The facts of this case are, in relevant part, undisputed. The following factual recitation is taken from the evidence adduced at the hearings on the plaintiff's pension application held before the Board on August 25, 2017, and March 27, 2018.

¶ 3 Certain facts noted by the Board relating to Ryan's medical treatment prior to the October 25, 2014, incident are relevant to the resolution of this appeal. On November 8, 2004, Ryan was treated at Rush Oak Park Hospital for "severe, acute anxiety." On December 17, 2004, following an incident where Ryan was at home acting unusual while in possession of a firearm, he was taken to Gottlieb Hospital and admitted to the psychiatric ward. The police report of the incident states that Ryan was having problems with narcotics and had consumed numerous prescription drugs and drank nail polish remover. As a result, Ryan was placed on administrative leave from his position with the Cook County Sheriff.

¶ 4 The plaintiff testified that she first met Ryan in the fall of 2013. According to the plaintiff, when she first met him, Ryan admitted to being a recovering addict. Over the next six months, the plaintiff never saw Ryan drink alcohol, and the only medication he used was for his blood pressure. She stated that Ryan attended a weekly Alcoholics Anonymous meeting on Friday evenings. Ryan and the plaintiff were married on February 14, 2014. The plaintiff testified that, from the time of their marriage until October 2014, Ryan did not consume alcohol, and he only took his blood pressure medication.

¶ 5 According to police reports, on October 25, 2014, Ryan and Officer Whitlock attempted to apprehend a suspected narcotics offender. Officer Whitlock observed the suspect reach for his waistband and saw a gun. When the suspect pointed the gun at Officer Whitlock, the officer fired several shots, striking the suspect. The report states that Ryan exited his vehicle after hearing the gunshots. While Ryan and Officer Whitlock were standing on the sidewalk, a car drove toward them. They responded by firing at the car, which sped off. The suspect was transported by ambulance to a hospital where he died. Ryan and Officer Whitlock were taken in a separate ambulance to Loyola Hospital's emergency room. According to the hospital records, Ryan was diagnosed with unspecified chest pain and released.

¶ 6 The following day, Ryan was examined at Loyola's immediate care facility. The records of that visit state that he complained of chest pains, palpitations, insomnia, and anxiety. He reported feeling stressed and unable to sleep; "[f]eels like he may be having anxiety and panic which he has had in the past." Ryan was given anti-anxiety medication and released.

¶ 7    On November 10, 2014, Ryan sought treatment with Dennis Delfosse, LCPC, who diagnosed him with "acute stress reaction." Delfosse's case review states: "Post shooting evaluation. Incident on 24 Oct. off work until further notice *** Anxiety, tension and temper problems at home *** sleep impaired ***some images and flashbacks." A case review dated December 11, 2014, states: "Good progress *** Believes he is ready for work *** Some sleep difficulty but minimal."

¶ 8    On October 13, 2015, Ryan was seen by Dr. Gigante for blood pressure issues. In his report of that visit, Dr. Gigante wrote: "PT diagnosed recently with HTN and has HX of chronic general anxiety disorder which is well controlled with Klonopin."

¶ 9    In a case review dated October 15, 2015, Delfosse noted that Ryan "reports he has a psychiatrist who will now follow him with EMDR TX and medication MGT *** Will discontinue SVCS here."

¶ 10    On October 19, 2015, Ryan was admitted to Advocate Lutheran General Hospital. The record of that admission states: "psychiatric stabilization and detox management from the various medications he has been taking for the past year. Problems for him began on 10/24/2014, when there was a death of a suspect in which he was involved as a Maywood police officer." On October 23, 2015, Ryan was evaluated by Dr. Cynthia Gordon of Advocate's behavioral health group. In her assessment, Dr. Gordon noted: "Depression *** Panic disorder without agoraphobia *** Post-traumatic stress disorder chronic." She also noted that Ryan denied, among other thoughts, suicidal ideation, suicidal intent, and suicide plans.

¶ 11    Ryan was treated by Dr. Diane Heidmann at the Rehab Institute of Chicago for pain management associated with two torn rotator cuffs. On July 7, 2016, Dr. Heidmann prescribed, among other drugs, hydrocodone for pain, one tablet of which was to be taken every 4 hours as needed. In her report of that visit, Dr. Heidmann recorded that Ryan had been seeing Dr. Madison, a pain specialist, and that he had been prescribed hydromorphone. She also noted that Ryan was "[u]nder care of a psychiatrist for PTSD. He is currently on disability. Used to work as a police officer. His symptoms started after he shot someone." The plaintiff acknowledged that Ryan was prescribed pain medication following rotator cuff surgery in March 2016, and she admitted that he took excessive medication.

¶ 12    On July 12, 2016, Ryan was found dead in his home. The Office of the Cook County Medical Examiner conducted a postmortem examination. The toxicology report noted that numerous prescription drugs were found in Ryan's blood. Assistant medical examiner Dr. John Gates performed the postmortem examination. Dr. Gates's report of the examination dated October 7, 2016, states:

> "This 35-year-old white male, RYAN L. GATZ, died of combined drug (hydrocodone, hydromorphone, alprazolam, flurazepam and acetaminophen) toxicity. Hypertensive cardiovascular-disease and obesity were significant contributing conditions."

As to manner of death, the report states "ACCIDENT." Ryan's death certificate also lists the manner of death as "ACCIDENT."

¶ 13    In his investigation case report, Investigator Briggs of the medical examiner's office noted that no suicide note was discovered at Ryan's residence. He did, however, record having found 18 prescription drug containers in Ryan's residence on July 13, 2016. Of particular note was a container for hydrocodone which, on its label, indicated that the drug was prescribed by Dr.

"Hedmann" [*sic*] and that the prescription for 180 pills was filled on July 7, 2016. According to Briggs's report, nine hydrocodone pills remained in the container when he found it. Also recovered by Briggs was a container for hydromorphone, which, on its label, indicated that the drug was prescribed by Dr. Madison and that the prescription for 90 pills was filled on June 23, 2016. According to Briggs's report, six pills of that drug remained in the container.

¶ 14   The plaintiff testified that, after the October 25, 2014, incident, Ryan appeared obviously shaken and would talk about the incident, "seeking confirmation that he made the right decision and he felt bad that someone lost their life that night." According to the plaintiff, she never saw any indication that Ryan was suicidal, and Ryan never discussed, or stated, that he was suicidal.

¶ 15   In addition to the medical records of Ryan's treating health care providers, both before and after the incident of October 25, 2014, and testimony from the plaintiff, the Board also considered the reports of three physicians who, at the Board's request pursuant to section 3-115 of the Code (40 ILCS 5/3-115 (West 2016)), had examined Ryan's medical records and other relevant documentation.

¶ 16   Dr. Robert Reff, a psychiatrist, opined in his January 8, 2017, report that Ryan's death was a result of the October 25, 2014, fatal shooting. Dr. Reff stated that the shooting aggravated Ryan's "pre-existing anxiety disorder, caused him to suffer from PTSD, contributed to a reoccurrence of alcoholism and drug abuse which ultimately led to his death." Dr. Reff's report states:

> "It is my opinion that prior to the incident on October 25, 2014, Mr. Gatz had been treated for a Panic Disorder and was sober from the use and abuse of alcohol for a prolonged period. There was no evidence that he was misusing medication that had been prescribed for the treatment of his psychiatric condition. Based on the records reviewed, Mr. Gatz appears to have suffered from Acute Stress Disorder which ultimately became chronic Posttraumatic Stress Disorder. It is my opinion that because of the PTSD which was caused by the 10/25/2014 incident, Mr. Gatz began drinking excessively as well as abusing opiate painkillers and benzodiazepine tranquilizers. It is my opinion that but for the incident that Mr. Gatz was involved in on 10/25/2014, he would not have suffered from chronic PTSD and would not likely have resumed drinking and abusing drugs."

¶ 17   In a supplemental report issued on December 27, 2017, after having reviewed additional records, Dr. Reff stated:

> "It remains my opinion, to a reasonable degree of medical psychiatric certainty, that [Ryan's] death was the result of sickness, accident, or injury incurred in or resulting from the performance of an act of duty, specifically having been involved in a fatal shooting on 10/25/2014."

¶ 18   Dr. Stevan Weine, a psychiatrist, in his report dated January 24, 2017, also opined that Ryan's death was a result of the October 2014 fatal shooting. Dr. Weine concluded that the shooting incident was an extreme traumatic event that caused Ryan to suffer from new conditions of PTSD and major depression. He stated:

> "[I]t is most likely that Officer's Gatz's death was a result of sickness, accident, or injury incurred in or resulting from performance of an act of duty. The evidence indicates that he was abusing his medications and overdosed, either accidentally or

intentionally. This was caused by the Chronic PTSD, Major Depression, Panic Disorder, and Benzodiazepine/Sedative Hypnotic Dependence that he experienced following the traumatic experience related to the October 24, 2015 [*sic*] shooting. It is also worth noting that his problem with Benzodiazepine/Sedative Hypnotic Dependence was a pre-existing condition which was likely exacerbated by the act of duty incident. Although Officer Gatz had received some psychiatric and psychotherapeutic treatment for his conditions, he continued to have significant symptoms."

However, Dr. Weine qualified his opinion by noting that it was possible the cause of death was unrelated, stating:

"I cannot completely rule out the possibility, as noted by the Medical Examiner, that Officer Gatz died of a medical cause related to his pre-existing conditions of hypertension (including hypertensive episodes), cardiomegaly, and cardiomyopathy. In that case, the cause of death would not have any relationship with an act of duty."

¶ 19    Dr. Geoffrey S. Shaw, also a psychiatrist, opined in his report that there was no evidence that Ryan died as "a direct result" of his PTSD. Dr. Shaw noted that Ryan had a long history of substance abuse and addiction which predated the October 2014 incident. In his report, Dr. Shaw noted:

"The medical examiner's report records his [Ryan's] death, as being accidental and due to excessive ingestion of multiple medications, including Narcotic and tranquillizer medications. Indeed, he had taken a large quantity of medications (reportedly as much as 171 Hydrocodine pills over a six-day period) in combination with tranquillizer medications. He succumbed, most likely, to respiratory depression."

On the issue of causation, Dr. Shaw stated: "Of note, there was a long history of substance abuse and addiction which predated the incident in October 2014. [Ryan's] death was accidental and not directly attributable to his performance/duties as a police officer with the Maywood Police Department."

¶ 20    On March 27, 2018, the Board voted to deny the plaintiff's application for a surviving spouse's pension pursuant to section 3-112(e) of the Code. On June 18, 2018, the Board issued a written decision, finding that Ryan's death "was not the result of sickness, accident, or injury incurred in or resulting from the performance of an act of duty." In that decision, the Board recounted the evidence and the opinions presented by Drs. Reff, Weine, and Shaw. The Board found that the report of Dr. Shaw was "well-reasoned, thorough, and instructive." It also found "most persuasive" the conclusion contained in the medical examiner's report of postmortem examination, authored by Dr. Gates, that the cause of Ryan's death was an "Accident." The Board found it significant that two of the drugs, hydrocodone and hydromorphone, found in Ryan's system at the time of his death were prescribed for pain following shoulder surgery not for mental health reasons. The Board concluded that, in light of Ryan's history of mental health treatment and addiction, his death was not the result of an "act of duty." In addition, by reason of the fact that Ryan died with less than 10 years of creditable service as a police officer, the Board found that the plaintiff is ineligible for the award of a nonduty surviving spouse pension pursuant to section 3-112 (c) of the Code (*id.* § 3-112(c)).

¶ 21    Following the Board's denial of her application for a surviving spouse's pension, the plaintiff sought administrative review of the Board's decision in the circuit court. The circuit court confirmed the Board's decision, and this appeal followed.

¶ 22   This matter comes to this court on appeal from the circuit court's judgment in an administrative review action. As a consequence, our role is to review the decision of the Board, not the reasoning of the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006).

¶ 23   The applicable standard of review in this case depends upon whether the question presented is one of fact, one of law, or a mixed question of law and fact. *Id.* at 532. When, as here, the issue is whether the evidence of record supports the Board's denial of the plaintiff's application for a surviving spouse's pension, the issue is one of fact, and we apply the manifest weight of the evidence standard of review. *Id.* at 534; see also *Carrillo v. Park Ridge Firefighters' Pension Fund*, 2014 IL App (1st) 130656, ¶ 22.

¶ 24   In applying a manifest weight standard of review to the Board's decision, we will not disturb the Board's findings of fact unless an opposite conclusion is clearly apparent. *Marconi*, 225 Ill. 2d at 534. Section 3-148 of the Code (40 ILCS 5/3-148) (West 2016)) states that judicial review of the Board's decisions is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)). The Administrative Review Law provides that the "findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct." *Id.* § 3-110. In deciding questions of fact, it was the Board's function to judge the credibility of the witness, assign weight to the evidence, and resolve conflicts in medical evidence. See *Marconi*, 225 Ill. 2d at 543; see also *Peterson v. Board of Trustees of the Firemen's Pension Fund*, 54 Ill. 2d 260, 263 (1973). Whether we would have reached the same conclusion is not the test of whether the Board's decision is against the manifest weight of the evidence. So long as the record contains evidence supporting the Board's decision, the decision should be affirmed. *Marconi*, 225 Ill. 2d at 534.

¶ 25   On appeal, the plaintiff maintains that the Board erred in deciding that Ryan's death was not the result of an act of duty as required by section 3-112(e) of the Code. She argues that the Board applied an incorrect standard for causation. According to the plaintiff, the Board "relied solely on the report of Dr. Shaw who found no 'evidence that his [Ryan's] death occurred as a *direct result* of his PTSD' and was '*not directly attributable* to his performance/duties as a police officer with the Maywood Police Department.' " (Emphases in original.)

¶ 26   Section 3-112(e) of the Code provides that:

"The pension of the surviving spouse of a police officer who dies (i) on or after January 1, 2001, (ii) without having begun to receive either a retirement pension payable under Section 3-111 or a disability pension payable under Section 3-114.1, 3-114.2, 3-114.3, or 3-114.6, and (iii) as a result of sickness, accident, or injury incurred in or resulting from the performance of an act of duty shall not be less than 100% of the salary attached to the rank held by the deceased police officer on the last day of service, notwithstanding any provision in this Article to the contrary." 40 ILCS 5/3-112(e) (West 2016).

¶ 27   Although the plaintiff incorrectly fixed the standard of review as clearly erroneous, under any standard of review, she was the burdened party in this administrative review proceeding. *Marconi*, 225 Ill. 2d at 532-33. As the Board correctly held, to obtain a line-of-duty pension, the applicant is required to prove that (1) he or she is the surviving spouse of a police offer who died on or after January 1, 2001; (2) without having begun to receive either a retirement pension or a disability pension; and (3) the death of the police officer was the result of sickness, accident, or injury incurred in or resulting from the performance of an act of duty.

¶ 28        In this case, it is uncontroverted that the plaintiff is the surviving spouse of Ryan, a police officer who died after January 1, 2001, and who, at the time of his death, had not begun receiving either a retirement pension or a disability pension. Therefore, the issue before this court is whether the Board's conclusion that the plaintiff failed to prove that Ryan's death was the result of sickness, accident, or injury incurred in or resulting from the performance of an act of duty is against the manifest weight of the evidence.

¶ 29        The plaintiff focuses her contention that the Board applied an incorrect legal standard to the question of whether Ryan's death was the result of his performance of an act of duty on the passage in Dr. Shaw's report where he concluded that Ryan's death was not "directly attributable" to the performance of his duties as a police officer. The plaintiff correctly asserts that she was not required to prove that Ryan's performance of an "act of duty" was the sole cause of his death (see *Alm v. Lincolnshire Police Pension Board*, 352 Ill. App. 3d 595, 598 (2004)) or the originating or primary cause (see *Barber v. Board of Trustees of the Village of South Barrington Police Pension Fund*, 256 Ill. App. 3d 814, 818 (1993)); rather, she was only required to prove that an "act of duty" was a cause contributing to Ryan's death (see *Luchesi v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 333 Ill. App. 3d 543, 550 (2002)). She appears to argue that the opinions of Drs. Reff and Weine, who concluded that the PTSD, which Ryan developed following the October 25, 2014, shooting incident, caused him to abuse prescription drugs, which led to his death, satisfied her burden to prove that an "act of duty" was a cause of Ryan's death.

¶ 30        As noted earlier, it was the function of the Board to assess the credibility of Drs. Reff and Weine and determine the weight to be given to their opinions. The Board found the opinions of Drs. Reff and Weine to be "less persuasive" than those of Drs. Shaw and Gates. As to Dr. Reff, the Board noted that his report failed to discuss or refute the conclusions contained in the medical examiner's report of postmortem examination authored by Dr. Gates. With respect to Dr. Weine's causation opinion, the Board noted that, although he stated that it was "most likely" that Ryan's death was a result of an act of duty, he admitted that it could not be completely ruled out that Ryan died from medical causes related to his preexisting conditions of hypertension, cardiomegaly, and cardiomyopathy as noted in Dr. Gates' report.

¶ 31        Contrary to the plaintiff's assertion, the Board did not rely "solely on the report of Dr. Shaw" in reaching its conclusion that Ryan's death was "accidental and a result of combined drug toxicity along with hypertensive cardiovascular disease and obesity and not an 'act of duty.' " Although the Board found Dr. Shaw's report to be "well-reasoned, thorough, and instructive," it was the conclusions contained in Dr. Gates's report of the postmortem examination that the Board found to be "most persuasive." In addition to the opinions of Drs. Shaw and Gates, the record contains other evidence supporting the Board's decision.

¶ 32        When examined by Dr. Gordon at Lutheran General Hospital on October 23, 2015, Ryan denied suicidal ideation, suicidal intent, and suicide plans; the plaintiff testified that Ryan never stated that he was suicidal; Briggs found nine hydrocodone pills and six hydromorphone pills still remaining in their respective prescription containers when he searched Ryan's residence on July 13, 2016; and no suicide note was found. From these facts, the Board could reasonably conclude that Ryan did not commit suicide. The narcotic medication, hydrocodone and hydromorphone, which was found in Ryan's system at the time of his death, was prescribed by Drs. Heidmann and Madison for the chronic pain Ryan suffered following his shoulder surgery, and the plaintiff admitted that Ryan had been taking excessive amounts of pain

medication. There is no evidence that Ryan was taking pain medication as a result of the October 25, 2014, on-duty incident. The Board could reasonably have found that Ryan's excessive use of narcotic pain medication was attributable to the pain he was suffering as a result of his non-duty-related shoulder surgery. In addition, Ryan had a history of mental health treatment and addiction before October 25, 2014.

¶ 33    The record in this case reveals a factual dispute as to the factors causing or contributing to Ryan's death. It was the Board's function to resolve the factual dispute, and its findings of fact are, by statute, held to be *prima facie* true and correct (735 ILCS 5/3-110 (West 2016)) and may only be reversed if they are against the manifest weight of the evidence. *Marconi*, 225 Ill. 2d at 540. We believe that the record contains sufficient evidence to support the Board's finding that Ryan's death was not the result of a sickness, accident, or injury incurred in or resulting from the performance of an act of duty. We conclude, therefore, that the Board's decision denying the plaintiff a surviving spouse's pension pursuant to section 3-112(e) of the Code is not against the manifest weight of the evidence, and we affirm the judgment of the circuit court.

¶ 34    Affirmed.